UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:11 CR 246 CDP |
| | ) | |
| JAMES C. SMITH(1), | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, and SENTENCING OPINION

At the April 12, 2013 sentencing hearing, I imposed a ten-year sentence on defendant James C. Smith. This opinion sets out my findings of fact on contested factual issues, my conclusions of law regarding the advisory sentencing guidelines, and my rationale for selecting the ten-year sentence. My findings are based on the preponderance of the evidence presented at trial and at the sentencing hearing. Except as set forth here, I adopt the findings of fact and legal conclusions set out in the presentence report (PSR). The numbering below corresponds to the paragraph numbers in the objections, and each finding specifies the paragraph number within the PSR to which it refers.

3. Defendant's general objection that the offense conduct section of the PSR is biased in favor of the government is overruled.

4. The phrase "*and enrich the members and associates through*

*criminal activity*" is stricken from Paragraph 29. Paragraph 29 is otherwise accurate. Members paid dues, and some members sold drugs and guns, but there was no evidence that this money-making criminal activity was a specific purpose of the organization.

  5 - 6. The last sentence of paragraph 30 is stricken, and the following sentence is inserted in its place: "*A small percentage of WOS members have achieved 1%er or diamond status, which is a term used to describe members of OMGs who are represented to others as being members who routinely engage in significant criminal activity.*" Paragraph 30 is otherwise accurate. The evidence showed that wearing a 1%er or diamond patch was a status symbol conferred more by reason of rank or favor within the organization than because of criminal activity. The evidence also showed that WOS members intended that 1%er or diamond patches be perceived by others as evidence that the wearer routinely engaged in criminal activity.

  7. Paragraph 31 is accurate. Although narcotics trafficking was undertaken by some members and was not one of the purposes of the organization, it was part of the criminal behavior some members engaged in and was used, at least in part, to enhance the prestige of the WOS enterprise in the eyes of others by showing others that WOS was an outlaw motorcycle gang; it

was not unrelated to the organization.

8 - 9. In Paragraph 33 the phrase "*and Smith discussed ongoing issues with the Sin City Disciples, stating that anyone not wearing WOS patches should be considered enemies*" is stricken. Paragraph 33 is otherwise accurate.

10. Paragraph 35 is accurate.

11. The third sentence of Paragraph 38 is amended to strike the phrase "*the distribution of crack cocaine.*" Paragraph 38 is otherwise accurate.

12. The second sentence of paragraph 39 is amended to omit the phrase "*for the common purpose of raising funds on behalf of WOS.*" Paragraph 39 is otherwise accurate.

13. Paragraph 40 is stricken in its entirety.

14. Paragraph 41 is stricken in its entirety.

15. Paragraph 43 is stricken in its entirety.

16. Paragraph 44 is accurate.

17. Paragraph 47 is stricken in its entirety.

18. The last sentence of paragraph 49 is stricken.

19 - 23. The third sentence of paragraph 50 is stricken. The words "*including murder*" are stricken from the fourth sentence. In the last sentence the phrase "*had prior knowledge of events planned by other members of the WOS*

*and*" is stricken. Paragraph 50 is otherwise accurate.

24. Paragraph 52 accurately sets out the government's contentions about culpability levels, but I am not adopting these contentions. It is not necessary for the court to determine precise culpability levels among the 22 defendants in this case. As I stated at the sentencing hearing, I agree with defendant Smith that he is not more culpable than several other defendants who actually carried out or assisted in the carrying out of various murders.

25 - 35. <u>Guideline Calculations and Sentence Imposed:</u> The following are my conclusions about the guidelines and my reasons for the 10 year sentence that I imposed. As stated at the sentencing hearing, I am overruling Smith's objection to the four level enhancement under U.S.S.G. § 3B1.1(a), as I agree that he was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. Although I am sustaining in part Smith's other objections to the calculations, I am not adopting his proposed guidelines. The guidelines calculations set out here are substituted for the guidelines calculations set out in Paragraphs 66 through 91 of the PSR.

The guideline provision for racketeering, U.S.S.G. § 2E1.1, directs that the base offense level is 19 or the offense level applicable to the underlying racketeering activity. As stated at the sentencing, I believe the PSR is incorrect

because it uses the offense levels applicable to conspiracy to commit murder, attempted murder, and conspiracy to commit arson. I here provide a more detailed explanation for my reasons.

Smith was convicted of a racketeering conspiracy, and, as set forth in my earlier order denying his motion for judgment of acquittal, there was more than ample evidence from which the jury could find, beyond a reasonable doubt, that Smith agreed with others to conduct or participate in the affairs of the enterprise through a pattern of murder, conspiracy to murder, attempted murder, arson, robbery, witness tampering and evidence tampering, and that he specifically agreed that at least two such acts would be committed by a conspirator. Smith, as the National Vice President, actively participated in the affairs of the enterprise. The WOS had a hierarchical structure, and Smith was the highest-ranking person in charge of most of the activity of the WOS. He presided over national and other meetings, he gave advice to officers of the various local organizations who solicited his advice and reported all significant events to him, he instructed others on their expected behavior as members of the enterprise, including such things as when they could wear their colors, that they should not talk about WOS business to their families or on the telephone, and that they must act to uphold the reputation of the WOS.

Smith was aware that the WOS members routinely carried guns and was informed of various acts of violence committed by members. Even after being told of shootings and other violent acts, he actively encouraged WOS members to do whatever was necessary to maintain the WOS's status, and to retaliate against anyone who disrespected the WOS, whether they be members of the WOS or others. He was directly involved in discussing with WOS members the need to falsely sign as witnesses to a shooting committed by Jerry Peteet. He told members which rival clubs the WOS was "at war" with and with whom the WOS had ongoing disputes, while at the same time advising members that they should stand up to others if their dominance was challenged. Allan Hunter advised him in advance that he was going to go to the Hells' Lovers clubhouse to commit an act of violence, and later told him that the plan was not carried out and that a WOS member was arrested with a pipe bomb and gun that they had intended to use against the rival club. Hunter and others informed him of various shootings and murders that WOS members had been involved in. The evidence showed that Smith performed many acts involved in the operation and management of the organization, including running meetings, providing patches and other paraphernalia, and instructing others on the expectations of the organization.

The evidence showed that Smith was told after the fact that members had been engaged in shootings (and in some cases had been shot), but there was no evidence that Smith himself was ever physically connected with the shootings or that he specifically knew of them in advance. Although he knew and approved of Allan Hunter's intention to commit some kind of violent act against the Hell's Lovers, there is no evidence that he understood it was to be a pipe bombing or arson. Thus, I believe the conspiracy to murder, attempted murder, and conspiracy to commit arson guidelines are not appropriate in his case.

The relevant conduct guidelines recognize that in a conspiracy, the relevant conduct on which a sentence should be based will not necessarily be the same for each co-conspirator. *See* § 1B1.3(a)(1)(B) and Application Notes following. While the beginning point for any guidelines calculation begins with the charge of conviction, the actual conduct of the defendant must be taken into consideration. As discussed at the sentencing hearing, in a complex RICO conspiracy where the jury was not asked to find that the defendant committed specific predicate acts, determining the proper "underlying racketeering activity" for guidelines purposes is not simple. After considering the actual conduct of defendant James Smith, I conclude (in his case only), that the aggravated assault sentencing guideline is the most most analogous guideline to the conduct that

Smith actively encouraged and/or directed the WOS members to engage in. I have therefore calculated the sentence using guideline § 2A2.2. I recognize that assault is not a listed predicate act in 18 U.S.C. § 1961(1), but I nevertheless believe using this guideline is appropriate for sentencing purposes.[1] I therefore conclude that the following calculations should apply.

| | |
|---|---|
| Base Offense Level: § 2A2.2(a) | 14 |
| Discharge of firearm: § 2A2.2(b)(2) | +5 |
| Serious bodily injury: § 2A2.2(b)(3)(B) | +5 |
| Role in the Offense: § 3B1.1(a) | +4 |
| Adjusted Offense Level subtotal | 28 |

Application Note 1 to § 2E1.1 directs that where there is more than one underlying offense, each should be treated as a separate count of conviction. Because multiple victims were involved, these would not be grouped under § 3D1.2, but instead should be combined under the rules of § 3D1.4. But it is impossible to determine the number of assaults Smith should be held responsible for. I have chose to assume only two assaults, which results in two units under § 3D1.4(a), and that guideline directs me to add two levels, for a total offense level of 30.

---

[1] I considered using the obstruction of justice or subornation of perjury guidelines contained in § 2J1.2 or § 2J1.3, but do not believe those guidelines reflect the seriousness of the defendant's conduct, just as I believe the murder guidelines overstate the seriousness of the defendant's conduct, given, as set out above, the evidence that he was told of the murders and murder conspiracies only after the fact.

|                              |     |
|------------------------------|-----|
| Adjusted Offense Level subtotal | 28  |
| Multiple count adjustment    | +2  |
| Total Offense Level          | 30  |

Smith has no prior convictions, so he is in criminal history category I. For a total offense level of 30 and criminal history category I, the guidelines range is 97 to 121 months. I sentenced Smith to 120 months.

I believe this sentence is appropriate for Smith for a variety of reasons, and have considered all of the sentencing factors under 18 U.S.C. § 3553(a). Because Smith's situation is different from that of all the other defendants in this case, and because there are a number of ways the guidelines calculations could properly be calculated, I have considered what the sentence would be under alternative guidelines calculations. The Presentence Report concluded that the guidelines range was 240 months, which is the statutory maximum. In my opinion, when considering all the § 3553(a) factors, this sentence is greater than necessary to meet the sentencing objectives. If I had used the racketeering base offense level of 19 set out in § 2E1.1(a)(1), the total offense level would be 23, after adding the 4 levels adjustment under § 3B1.1(a) for Smith's role as a leader or organizer. The guidelines range for total offense level 23 and criminal history category I is 46-57. In my opinion, a sentence in this low range would not be sufficient to meet the sentencing objectives. If I had used the obstruction of

justice offense levels in Part J of the guidelines, the range would have been even lower. Using the arson guideline without the murder guidelines results in the same guideline calculation I have used here. And although the government filed a motion for upward departure under § 5K2.1, consideration of that departure requires looking at many of the same factors I must consider under § 3553(a), and does not alter my conclusion that a ten year sentence is appropriate for Smith.

Smith is 66 years old and has no prior convictions. He has been steadily employed in law-abiding work his whole life, and in fact began working at a very young age to support his mother and siblings, because he grew up in poverty. He has steadily supported his girlfriend, with whom he has lived for 25 years and who has a variety of health issues, and he supported her children when they were growing up. While this racketeering conspiracy was extremely serious, and the co-defendants engaged in substantial violence, there is no evidence that Smith himself engaged in any violence or narcotics trafficking or was even present when it was being committed. For this reason he is substantially less culpable than many of the other defendants, including Allan Hunter, who cooperated with the government and received a departure under § 5K1.1 and an ultimate sentence of 102 months. I agree with the government that

Smith's sentence should be higher than Hunter's was, because Hunter cooperated and accepted responsibility for his actions, which Smith has not done. While I am not required to determine exact culpability rankings, and the sentence for any one individual does not need to be calibrated exactly among co-defendants, it is necessary that I consider whether the sentence gives rise to any unwarranted sentencing disparities, *see* § 3553(a)(6), and I conclude that it does not. It also provides Smith a chance to leave prison during his lifetime and be in a better position to pay restitution to the victims. *See* § 3553(a)(7).

The sentence must be sufficient, but not greater than necessary, to meet the purposes set out in § 3553(a)(2). A sentence of 10 years for Smith reflects the seriousness of the crime, should promote respect for the law, and provides just punishment for his actual conduct. It also should provide deterrence to others and should protect the public from any further crimes of this defendant. Defendant will have the opportunity to earn his GED while in prison, and I am not aware of any other correctional treatment that he needs. Any sentence above ten years, even if the guidelines range had properly been calculated as 240 months, would be greater than necessary to meet the sentencing objectives. Thus, even if the guidelines range had been higher, I would have varied downward and would have imposed the same sentence.

36. Paragraph 119 of the PSR is stricken and the following is inserted in its place: "**Guideline Provisions**: Based upon a total offense level of 30 and a criminal history category of I, the guideline imprisonment range is 97 months to 121 months."

37. Paragraph 136 is appropriate as written.

**IT IS HEREBY ORDERED** that the Clerk of Court shall docket this opinion separately in the public file, and shall also attach a copy of it to the Presentence Report that is filed under seal, so that it will accompany the report that is provided to the Bureau of Prisons or is otherwise lawfully disseminated. The Clerk of Court shall also attach a copy of this Opinion to the sealed Statement of Reasons.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 17th day of April, 2013.